CARR, J.
The cause depends wholly upon the question, Whether the magistrates-who took the privy examination of Mrs. Currie, were authorized by law to do so?' The question is one of positive law.
At the common law, a feme covert could make no deed. By statute she can make a valid deed, if it be executed under those forms and with those solemnities required by law; but if any of these be omitted or mistaken, the deed is void. With respect to our early legislation on this subject, it is briefly but accurately stated in a note of the learned editor of the Revised Code of 1819, vol. I, p. 366. “By the acts of 1674, 1705 and 1710, the privy examination and acknowledgment of femes covert to deeds, could only be taken of the femes personally, by the general or county court, where the deed was recorded. The act of 1734 provided, that a commission might be issued by the clerk of the general, or any county court, to two or more commissioners, being justices of the county where the feme shall reside, to take and certify her privy examination and acknowledgment; and the law was declared to be, that such privy examination and acknowledgment were not binding on the feme, unless recorded. And the provisions of this act of 1734 were substantially re-enacted *by the act of 1748. The report of the committee of revisors of 1784, and after them, the assembly of 1785, made a slight alteration; requiring that the commission should issue from the court where the deed ought to be recorded, and be executed by two justices of the peace of that county in which the feme dwelleth.” Thus stood the law, at the date of the deed in question ; requiring that the feme should be examined in open court, or before two justices of the peace of that county in which she dwelleth. The commission for taking the privy examination, in the case before us, issued to and was executed by the recorder and an alderman of the city of Richmond, where the feme covert resided.
It was insisted, that this was not a good privy examination, because the recorder and alderman of Richmond could, by no intendment of law or reason, be regarded as two justices of the peace of Henrico, the county in which the feme dwelt. On the other hand, the examination was asserted to be good, 1. because the law incorporating the city of Richmond, enacts, that the mayor, recorder and aldermen, shall each be vested with the powers of justices of the peace within the city; 2. because, if this law did not clothe the magistrates of the corporation with the power of privy examination, such had been the general opinion and practice, and communis error facit jus.
As to the first, it is obvious to remark, that we should naturally expect to find the manner of taking privy examinations, and the persons empowered to take them, set out and regulated in the general law of con *450 veyances, rather than in a local act establishing a corporation. In the general statute, the subject was directly before the legislature:, its title was, an act to reduce into one, the several acts for regulating conveyances. Accordingly, we find many pages taken up in the most particular and minute details of all the forms and ceremonies, necessary to the perfection of deeds of every kind; and this, among others, who shall take the privy examination of femes covert, and how they shall be taken, is most particularly attended to, and settled (with some slight variation) in the same way in which it had stood *for fifty years. It is most evident, that the legislature supposed it had regulated the whole subject by this law. If, then, the law of the corporation and this general law bore even date, I should hardly look to the local act, to narrow or extend the range of the general law, on a subject not local but general. The laws, however, are not of the same date. The general law is the latest. But let us look to the particular words of the act of incorporation of 1782. [The judge read them.] It seems very clear to me, that in using the words of that act, the legislature never thought of deeds or privy examinations. This subject was not in the slightest degree connected with that they were upon. They were meting out the judicial powers necessary to the officers of the corporation. The words profess and clearly purport this. Their powers in court had been described; it was necessary to give them judicial powers out of court; and the act says, they shall each be vested with the powers of justice of the peace, within the city, and for a mile round it, for matters arising within that space. What matters? evidently matters touching the internal police, and affecting the peace, quiet and order of the city. Could the taking privy examinations of femes covert, enter into this class of matters, arising within their jurisdiction? But again; they were to take jurisdiction of these matters, according to the lavys of the commonwealth: the established laws, then, were to be their guide. This is perfectly right and intelligible, if we understand the powers as relating to the peace, order and other judicial duties of justices of the peace out of court; but not at all so, if we make it relate to the privy examination of femes covert. It would certainly be contrary to the settled rules of construction to take the words, “shall be vested with the powers of justice of the peace,’’ separate from the other words of the sentence, when those other words were so clearly meant to explain, limit and circumscribe their extent. But even if we should take them without their context, I think they may be plainly and fairly satisfied, without making them embrace the power of privy examination. Justices of the peace are well known, both *to the common law, and to our statutes from the earliest date, as judicial officers of the counties, holding courts, and exercising, in their counties, certain judicial powers, as conservators of the peace, and in other respects. When, therefore, this law creating judicial officers of the corporation, vests them with the powers of justices, the words, I think, are fully satisfied by giving them those judicial powers which were exercised by justices, and should not be extended, to any ministerial powers which the legislature had, for convenience, thought proper to vest in justices of the peace. This is clear enough without the context; with it, it is certain. But even suppose this, act of 1782, should be taken to empower magistrates of the corporation to take privy examinations; would not this be repealed by the statute of 1785, saying that the feme must be examined in open court, or before two justices of the peace of the county in which she dwelleth? If the maxim be true, that leges posteriores priores contrarias abrogant, this last law must have repealed the former; or it must be contended, that they are not leges contrarias, but may well stand together; in other words, that an alderman of the city of Richmond is a justice of the peace of Henrico.
I do not think it worth while to notice, particularly, the different laws creating the different corporate towns in the state (six, I believe, in number). The powers which they vest in the corporate magistrates, are pretty much the same with those of Richmond ; and if they were different, could not affect the question. The legislation on this whole subject of corporate powers, satisfies me, that it was never intended to give any of them, or their officers, the power of taking the privy examination of femes covert. Their courts, indeed, were not made courts of record, for deeds or wills, until long after the laws establishing them as corporations. But if any doubt as to the legislative meaning remained, it would seem to be removed by the statute of December 1796, concerning corporations; which enacts, that, from and after the passing thereof &c. the magistrates of any corporate town, shall have the same power to examine *privily, and take the acknowledgment of a feme covert to a conveyance, and to certify the same, as is by law given to justices of the peace of a county.” I conclude, that the act incorporating Richmond did not give to M’Clurg and Richardson the power to take the privy examination of Mrs. Currie.
But 2dly, it was argued, that though the actual legislation may not have given this power to the corporate magistrates of Richmond, the general opinion and practice of the town has given it to them, and this makes the law. From this position I dissent intirely. We have six corporate towns (I believe) in the state; all of them, except Petersburg, older than Richmond. We have not an atom of proof that this taking of privy examinations, was the practice of any corporation but Richmond; and yet if it was the practice, the records would shew it at once. But if we had the amplest proof from the records of all these corporate towns, I should deny that it would change the acts of the legislature, plainly set down. I shall not go into the discussion of the phrase communis error facit jus, which we find loosely used in some of the *451 old cases; for X hold, that the local construction of these corporations can in no sense be considered communis error. That means an universal opinion and usage. The case of The King v. Hogg, 1 T. R. 721, seems very apposite to this point. The question there was, whether under the statute 43 Eliz. ch. 2, a machine, which was in a house but not fixed to it, could be rated to the poor, so as to increase greatly the rate as against the occupier of the house and machine. The occupier thus rated appealed to the court of sessions, where the rate was confirmed, and they stated a case for the court of king’s bench, of which it was a part, “that the usage of the town of Rib-chester (where the house was) had been, not to rate personal property.” In the argument of the case, the counsel in support of the order of session, quoted the case of The King v. Saltrem, where it was decided, that the usage of a particular parish, could not control the' construction of an act of parliament; and The King v. Harman, where Probyn, *J., said, “usages that can vary the construction of an act of parliament, must be universal, and not only the usage of a particular parish.” On the other side, it was admitted, that the usage of a particular place could not control an act of parliament, but contended, that general usage might explain it. The court established the rate, in opposition to the usage without difficulty. Buller, J., said, “we are not to make, but to explain thelaw.” Grose, J., said “it has been argued, that this rate can not be supported, because it has not been the usage of Ribchester, to rate personal property. But we are interpreting an universal law, which can not receive different constructions in different towns. It is the general law of the land, that this kind of property should be rated; and we cannot explain the law differently by the usages of this or that particular place. If there had been an agreement entered into by all the inhabitants of the town, not to rate any particular species of property, for their own accommodation, that might have been binding upon themselves, as an agreement; but if a case be stated for the opinion of this court upon the law on the subject, we cannot construe the act of parliament, according to their agreement. As to usage, I am clears of opinion that it ought not to be attended to, in construing an act of parliament, which cannot admit of different interpretations. Where the words of the act are doubtful, usage may be called in to explain them.” I see other cases referred to, as supporting this doctrine; but I have not looked to them; for the case does not seem to me to need them. The statute of 1785, the last on the subject of taking the privy examination of femes covert, existing at the time of the deed in question, provided, that it must be by two justices of the peace of the county in which the feme dwelleth. No usage can control this law, if such had been proved: no usage of the city can make an alderman of the corporation a justice of the peace for Henrico.
The other judges concurred.
Decree affirmed.